CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>MARVIN EUGENE NORWOOD, and<br>LOUIE ALEXANDER SANCHEZ | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br><br>**12-1229M** |

FILED
CLERK U.S. DISTRICT COURT
MAY 21 2012
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

---

## Complaint for a violation of 18 U.S.C. § 922(g).

| NAME OF MAGISTRATE JUDGE<br>Honorable Andrew J. Wistrich | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br>July 21, 2011 | PLACE OF OFFENSE<br>San Bernardino<br>County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:


SEE ATTACHMENT A


BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
    (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the<br>foregoing is true and correct to the<br>best of my knowledge. | SIGNATURE OF COMPLAINANT |
|---|---|
| | Steven F. Goerke<br><br>OFFICIAL TITLE: Special Agent - Bureau of<br>Alcohol, Tobacco, Firearms and Explosives |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>ANDREW J. WISTRICH | DATE<br><br>May 21, 2012 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA: MAX B. SHINER *MS*    REC: Detention

A T T A C H M E N T   A

18 U.S.C. § 922(g)

On or about July 21, 2011, in San Bernardino County, within the Central District of California, defendants MARVIN EUGENE NORWOOD ("NORWOOD"), and LOUIE ALEXANDER SANCHEZ ("SANCHEZ"), knowingly possessed the following firearms and ammunition, in and affecting interstate and foreign commerce:

(1)  a Bushmaster model XM15-E2S .223 caliber semi-automatic rifle, bearing serial number L160418;

(2)  a Marlin model 700 .22 caliber semi-automatic rifle, bearing serial number 11400761;

(3)  a Mossberg model 500A 12-gauge semi-automatic shotgun, bearing serial number J309659;

(4)  a Llama model Minimax .45 caliber semi-automatic pistol, bearing serial number 761040534204;

(5)  a Smith & Wesson model 66-4 .357 caliber revolver, bearing serial number CAA7305;

(6)  50 rounds of Fiocchi .223 caliber ammunition;

(7)  5 rounds of Remington 12-gauge shotgun ammunition;

(8)  6 rounds of Federal Cartridge Company .45 caliber ammunition;

(9)  6 rounds of Remington .357 caliber ammunition.

Such possession occurred after defendant NORWOOD had been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Willful Infliction of Corporal Injury on a Spouse/Cohabitant, in violation of California Penal Code Section 273.5(a), in the Superior Court of the State of California, County of San Bernardino, case number FVI024018, on or about June 16, 2006.

Furthermore, such possession occurred after defendant SANCHEZ had been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Evading an Officer With Willful Disregard for Safety, in violation of California Vehicle Code Section 2800.2(a), in the Superior Court of the State of California, County of San Bernardino, case number FVA025751, on or about August 1, 2006.

Furthermore, such possession occurred after defendant SANCHEZ had been convicted of a misdemeanor crime of domestic violence, namely, Willful Infliction of Corporal Injury on a Spouse/Cohabitant, in violation of California Penal Code Section 273.5(a), in the Superior Court of the State of California, County of San Bernardino, case number MSB066236, on or about January 24, 2003.

A F F I D A V I T

I, Steven F. Goerke, being duly sworn, hereby depose and say:

1.    I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and I have been involved in federal law enforcement for 22 years.  I became a Special Agent on September 24, 1989, and I have received training in federal firearms laws and regulations at the ATF National Academy.  I regularly refer to these laws and regulations during the course of my duties.  I am currently assigned to the ATF-Glendale 1 Group for the Special Agent in Charge of ATF in Los Angeles.  While employed with ATF, I have personally participated in numerous investigations involving violations of federal firearms laws by prohibited possessors of firearms, the possession of illegal or unregistered firearms, dealing in firearms without a license, and firearms trafficking.  At the ATF Academy, I was trained in all aspects of conducting criminal investigations, with an emphasis on those related to firearms and explosives.  This training included methods related to firearms trafficking and dealing in firearms without a license.  Prior to being hired as a Special Agent, I was employed by the Dallas, Texas Police Department as a Police Officer for approximately seven years, from August 1982 to August 1989, and during that employment I

attended a 680-hour training academy. In the course of my
duties with the ATF, I have investigated hundreds of crimes
involving the use and/or possession of firearms under various
state and federal laws. During the course of criminal
investigations, I have identified and/or seized numerous
firearms and types of firearm ammunition. I have personally
manipulated, assembled, disassembled, and test-fired various
semi-automatic and/or automatic pistols, rifles, and shotguns.
I have arrested several dozen persons for firearm violations
and/or firearm-related crimes and have gained insight from the
subjects of these investigations regarding the practices of
firearm enthusiasts in purchasing and keeping firearms. I have
attended training presented by ATF personnel that focused on
firearm investigations, identification, and operation. I have
also worked closely with Assistant United States Attorneys
regarding firearm investigations and prosecutions.

2.   This Affidavit is made in support of a criminal
complaint and request for issuance of arrest warrants for LOUIE
ALEXANDER SANCHEZ ("SANCHEZ") and MARVIN EUGENE NORWOOD
("NORWOOD"), for violations of Title 18, United States Code,
Section 922(g), Prohibited Person in Possession of Firearms and
Ammunition.

3.   This affidavit is intended to show that there is
sufficient probable cause for the requested criminal complaint

and arrest warrants, and does not purport to set forth all of my
knowledge of or investigation into this matter.  The statements
set forth in this affidavit are based on my experience,
training, consultation with other investigators and other
reliable sources of information relative to this investigation,
including my review of the official reports of investigation and
the affidavit in support of the search warrant in this case.

<u>PROBABLE CAUSE</u>

4.  On July 21, 2011, investigators from the Los Angeles
Police Department ("LAPD"), Robbery Homicide Division ("RHD"),
executed a multi-location search warrant at the residences of
NORWOOD and SANCHEZ, and arrested NORWOOD and SANCHEZ pursuant
to judicially-issued arrest warrants for the offense of Mayhem,
in violation of California Penal Code Section 203.  The search
warrant and arrest warrants had been issued on July 19, 2011, by
Los Angeles Superior Court Judge Patricia M. Schnegg based on an
affidavit evidencing NORWOOD's and SANCHEZ's involvement in the
attack on Mr. Bryan Stow at the conclusion of a Los Angeles
Dodgers/San Francisco Giants baseball game on March 31, 2011
(the affidavit is attached hereto as Exhibit A).  The case
became known as the "Dodger Stadium Beating Case."  During the
course of the search of NORWOOD's residence, investigators
located several firearms as well as firearm magazines and live
ammunition.  Members of LAPD's Gang and Narcotics Division, Gun

Unit, including Detective Jerry Kowalsky, were requested to respond to the location to assist with the firearm investigation.

5. Gun Unit Detectives Tompkins, Mersereau, and Kowalsky arrived at 1126 W. Victoria Street in the City of Rialto, in San Bernardino County, within the Central District of California. This is the residence of NORWOOD. Detective Kowalsky was met by RHD Detective Gable who advised he had recovered firearms and ammunition from the garage attic crawl space at the residence. Detective Kowalsky observed the firearms and ammunition laid out on the garage floor for evidence recovery purposes. All evidence was recovered and booked into LAPD custody, and included the following:

a. A Bushmaster model XM15-E2S .223 caliber semi-automatic rifle, bearing serial number L160418. Attached to the Bushmaster rifle were a scope and a large-capacity magazine capable of accepting more than 15 rounds of ammunition.

b. A Marlin model 700 .22 caliber semi-automatic rifle, bearing serial number 11400761.

c. A Mossberg model 500A 12-gauge semi-automatic shotgun, bearing serial number J309659, which was loaded with 5 rounds of 12-gauge ammunition.

d. A Llama model Minimax .45 caliber semi-automatic pistol, bearing serial number 761040534204, which was loaded with 6 rounds of .45 caliber ammunition.

e. A Smith & Wesson model 66-4 .357 caliber revolver, bearing serial number CAA7305, which was loaded with 6 rounds of .357 caliber ammunition.

f. 30 rounds of .223 caliber ammunition contained in an AR-type large-capacity magazine.

g. 20 rounds of .223 caliber ammunition (contained in a box).

h. Two additional large-capacity magazines.

6. MARVIN NORWOOD was arrested at 1126 W. Victoria Street and was later interviewed by Detectives Marsden and Jackson. NORWOOD waived his Miranda rights and agreed to speak to the detectives. I reviewed a transcript of the recorded interview and learned the following:

a. NORWOOD stated that the guns were not his. NORWOOD stated that he knew they were there and he allowed SANCHEZ to store the guns at his house. NORWOOD stated SANCHEZ does not have a place to store the guns and he (NORWOOD) does.

b. NORWOOD admitted to holding some of the guns but not firing them. When asked what kind of guns were there, NORWOOD replied, "I know there's a couple of rifles and a couple of handguns". NORWOOD explained the guns were stored in the

attic of his garage and that SANCHEZ has had them for approximately a year.

7.    Later that same day a live line-up was conducted with the witnesses to the mayhem investigation and suspects SANCHEZ and NORWOOD.   SANCHEZ and NORWOOD were placed together in a holding area within the jail facility.   Their conversations were recorded.  I learned the following from my review of the transcript of the recording:

a.   Briefly, I noted NORWOOD and SANCHEZ made several references to "guns" and "heats" (street vernacular for firearms).   An example of this occurs near the beginning of their conversation when NORWOOD states, "You know they got the guns right?"   After a short exchange, NORWOOD again states, "They got the guns.  There is ain't no getting around that." SANCHEZ responds, "I'll have to make a deal man [unintelligible] take all the heat, for the heats.  What do you think?"  This statement by SANCHEZ, his lack of surprise upon first hearing about the recovery of firearms, and his apparent willingness to admit possession, indicates, to me, his knowledge that the firearms existed and were concealed in NORWOOD's residence. Shortly after this exchange, SANCHEZ asks NORWOOD, "You sure they found the heats?"   NORWOOD replies, "Yeah."   SANCHEZ then states, "I'm just gonna tell them they're mine [inaudible]. Fuck Marv, I am sorry man."   NORWOOD replies, "Shit happens

man." These statements by SANCHEZ further indicate that SANCHEZ knew the firearms were concealed in NORWOOD's residence and that they belonged to SANCHEZ. In addition, they corroborate NORWOOD's statement to the detectives that he allowed SANCHEZ to store the guns at his house.

b. Over the remaining pages of the transcript, several more references are made about firearms. There are no statements by SANCHEZ inquiring about which guns or any other statements indicating surprise that the guns existed, only apparent remorse that they were located. Based upon these conversations, the close relationship between SANCHEZ and NORWOOD, I believe that, although the firearms were recovered in the residence of NORWOOD, SANCHEZ also had knowledge of and intention to control them amounting to his possession of these firearms. Based on my training and experience with multiple individuals arrested in possession of firearms, I believe, based on their statements, that the firearms recovered were jointly possessed and available for use by both NORWOOD and SANCHEZ.

8. I reviewed an August 18, 2011 Forensic Print Comparison Report generated by the LAPD's Scientific Investigation Division, Latent Print Unit. The report documented three fingerprint lifts that were obtained from the Bushmaster assault rifle recovered from NORWOOD's residence. These prints were compared through the Automated Fingerprint

Identification System, and returned with a match, all to the same individual, Juan Manuel Delatorre.

9. On October 25, 2011, a search warrant was executed at 2290 Golden Avenue in Long Beach, California, the residence of Juan Delatorre. RHD detectives Carillo and King separately interviewed Juan Delatorre and his brother Eric Delatorre, who was also present at the residence. The interviews were recorded. The following is a summary of their interviews, based upon my review of the reports of the interviews:

a. Eric Delatorre explained that he dated SANCHEZ's sister and they have a child together. Eric identified SANCHEZ and NORWOOD from separate photographic line-ups. Eric said he bought the Bushmaster rifle around February 2011 (prior to the March 31, 2011 Dodger Stadium beating) on the street for $120 because he thought it was fake. He took it home and upon further inspection realized it was real. A week later, SANCHEZ came to the house to pick up his sister. Eric showed the rifle to SANCHEZ, who paid Eric $250 and took the gun. Eric also made a statement indicating SANCHEZ knew he was a suspect in the Dodger Stadium beating case, thereby providing a motive for him to hide his firearms: Eric stated that about a week before he was arrested, SANCHEZ told Eric that he (SANCHEZ) wanted to go to the Dodger game to "get his last bobble-head" doll.

b.  Juan Delatorre was interviewed and confirmed his brother Eric had a dating relationship with SANCHEZ's sister. He identified SANCHEZ from a photographic line-up but did not identify Norwood.  Juan described a time in February 2011 when SANCHEZ visited his house.  SANCHEZ was counting some money and was showing off a matted gray .45 caliber pistol, calling it his "baby."  This description is consistent with the Llama .45 caliber pistol that was recovered from NORWOOD's residence.

c.  Juan further stated that he recalled an incident eight to nine months prior to the interview in which his brother Eric showed him a Bushmaster rifle, similar to a military M-16 rifle.  Juan initially believed it was a toy but when he physically handled and manipulated it, he realized it was real. Juan initially denied knowing where the rifle came from, but later told the detectives more details about the rifle.  Juan explained a friend of his brother Eric's, a gang member possibly named "Trent," brought the rifle over and left it with Eric. SANCHEZ later came to the house and took the rifle.  Juan believed Eric may have been too intimidated by SANCHEZ to ask for the rifle back.  "Trent" asked for the gun back several times and Eric paid Trent $800 to avoid any further conflict.

d.  Juan also stated that he remembers Eric saying that SANCHEZ had asked Eric to buy him a "doll" from Dodger Stadium because he (SANCHEZ) can never go back there again.

10.   Also on October 25, 2011, a search warrant was served at the residence of the last known owner of the Bushmaster assault rifle recovered from NORWOOD's residence.   This individual stated that his residence was burglarized and the rifle was stolen.   He was unable to produce a police report detailing the theft.   He denied knowing SANCHEZ or NORWOOD.

11.   On November 2, 2011, ATF Special Agent David Hamilton, an ATF Interstate Nexus Determinations expert examined firearms and ammunition recovered from NORWOOD's residence.   SA Hamilton determined that the each of the firearms and all of the ammunition had been manufactured outside of the State of California, and had therefore moved in and affected interstate or foreign commerce.   Specifically, SA Hamilton determined the following:

a.   The Bushmaster model XM15-E2S .223 caliber semi-automatic rifle, bearing serial number L160418, was manufactured in West Jordan, Utah.

b.   The Marlin model 700 .22 caliber semi-automatic rifle, bearing serial number 11400761, was manufactured in North Haven, Connecticut.

c.   The Mossberg model 500A 12-gauge semi-automatic shotgun, bearing serial number J309659, was manufactured in North Haven, Connecticut.

     d.   The Llama model Minimax .45 caliber semi-automatic pistol, bearing serial number 761040534204, was manufactured by Fabrinor in Spain.

     e.   The Smith & Wesson model 66-4 .357 caliber revolver, bearing serial number CAA7305, was manufactured in Springfield, Massachusetts.

     f.   The 50 rounds of .223 caliber ammunition were manufactured by Fiocchi Munizioni S.p.A. in Italy.

     g.   The 5 rounds of 12-gauge ammunition were manufactured by the Remington Arms Company in Lonoke, Arkansas or Bridgeport, Connecticut.

     h.   The 6 rounds of .45 caliber ammunition were manufactured by Federal Cartridge Company in Anoka, Minnesota.

     i.   The 6 rounds of .357 caliber ammunition were manufactured by the Remington Arms Company in Lonoke, Arkansas or Bridgeport, Connecticut.

     12.   I reviewed criminal rap sheet information with regard to NORWOOD, and learned that he has been convicted of a felony offense.  I obtained certified court records evidencing NORWOOD has suffered the following felony conviction:  Willful Infliction of Corporal Injury on a Spouse/Cohabitant, in violation of California Penal Code Section 273.5(a), in the Superior Court of the State of California, County of San Bernardino, case number FVI024018, on or about June 16, 2006.

a.   I reviewed a Fingerprint Identification
Certification, prepared by LAPD Fingerprint Identification
Expert Nina Kaminsky, setting forth the results of her
examination of 10-print fingerprint booking records related to
NORWOOD.  The Certification confirmed that the fingerprint
impressions from NORWOOD's arrest in the above criminal case
were the same as the fingerprint impressions made during
NORWOOD's booking during his July 21, 2011 arrest by RHD.

13.   I reviewed criminal rap sheet information with regard
to SANCHEZ, and learned that he had suffered several criminal
convictions.  I obtained certified court records evidencing
SANCHEZ has suffered the following felony conviction:  Evading
an Officer With Willful Disregard for Safety, in violation of
California Vehicle Code Section 2800.2(a), in the Superior Court
of the State of California, County of San Bernardino, case
number FVA025751, on or about August 1, 2006.  The records
document that SANCHEZ was initially sentenced to 36 months'
probation and ordered to serve 180 days in jail; however,
SANCEZ's probation was later revoked and he was ordered to serve
16 months in state prison.  I also obtained certified court
records evidencing SANCHEZ has suffered the following
misdemeanor crime of domestic violence: Willful Infliction of
Corporal Injury on a Spouse/Cohabitant, in violation of
California Penal Code Section 273.5(a), in the Superior Court of

the State of California, County of San Bernardino, case number MSB066236, on or about January 24, 2003.

     a.  I reviewed a second Fingerprint Identification Certification, prepared by LAPD Fingerprint Identification Expert Nina Kaminsky, setting forth the results of her examination of 10-print fingerprint booking records related to SANCHEZ.  The Certification confirmed that the fingerprint impressions from SANCHEZ's arrest in the above two criminal cases were the same as the fingerprint impressions made during SANCHEZ AO.
~~NORWOOD~~'s booking during his July 21, 2011 arrest by RHD.

     14.  Based on the aforementioned facts and my training, experience, and knowledge of this investigation, there is probable cause to believe that NORWOOD, who has been convicted of a felony offense punishable by a term of imprisonment exceeding one year, and SANCHEZ, who has been convicted of a felony offense punishable by a term of imprisonment exceeding one year as well as a misdemeanor crime of domestic violence, both knowingly and intentionally possessed firearms and

/ / /

/ / /

/ / /

/ / /

/ / /

ammunition that had traveled in and affected interstate and

foreign commerce, in violation of Title 18, United States Code,

Section 922(g).

_____
STEVEN F. GOERKE
Special Agent,
Bureau of Alcohol, Tobacco,
Firearms & Explosives

Subscribed and sworn to before me

this the __ day of May, 2012

**ANDREW J. WISTRICH**
_____
ANDREW J. WISTRICH
UNITED STATES MAGISTRATE JUDGE

EXHIBIT A
SEARCH WARRANT AND AFFIDAVIT
dated July 19, 2011

SW NO.

# STATE of CALIFORNIA, COUNTY of LOS ANGELES,
# SEARCH WARRANT and AFFIDAVIT
## (AFFIDAVIT)

**Peace Officer Daniel T. Jenks** swears under oath that the facts expressed by him/her in the attached and incorporated **Affidavit** are true and that based thereon he/she has probable cause to believe and does believe that the articles, property, and persons described below are lawfully seizable pursuant to Penal Code Section 1524 et seq., as indicated below, and are now located at the locations set forth below. Wherefore, Affiant requests that this Search Warrant be issued.

_(Signature of Affiant)_

HOBBS SEALING REQUESTED: ☐ YES ☒ NO
NIGHT SEARCH REQUESTED: ☒ YES ☐ NO

## (SEARCH WARRANT)

THE PEOPLE OF THE STATE OF CALIFORNIA TO ANY PEACE OFFICER IN THE COUNTY OF LOS ANGELES: proof by affidavit, having been this day made before me by Peace Officer Daniel T. Jenks that there is probable cause to believe that the property or person described herein may be found at the location(s) set forth herein and that it is lawfully seizable pursuant to Penal Code Section 1524 et seq., as indicated below by "☒"(s), in that:

- ☐ property was stolen or embezzled;
- ☐ property or things were used as the means of committing a felony;
- ☐ property or things are in the possession of any person with the intent to use them as a means of committing a public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing their being discovered;
- ☒ property or things to be seized consist of any item or constitute any evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony;
- ☐ property or things to be seized consist of evidence that tends to show that sexual exploitation of a child, in violation of Section 311.3, or possession of matter depicting sexual conduct of a person under the age of 18 years, in violation of Section 311.11, has occurred or is occurring;
- ☒ there is a warrant to arrest a person;
- ☐ a provider of electronic communication service or remote computing service has records or evidence, as specified in Section 1524.3, showing that property was stolen or embezzled constituting a misdemeanor, or that property or things are in the possession of any person with the intent to use them as a means of committing a misdemeanor public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing their discovery;
- ☐ property or things to be seized include an item or any evidence that tends to show a violation of Section 3700.5 of the Labor Code, or tends to show that a particular person has violated Section 3700.5 of the Labor Code;

**You are Therefore COMMANDED to SEARCH:** (premises, vehicles, persons)

See SW & Affidavit A2-9

**For the FOLLOWING PROPERTY, THING(s) or PERSON(s):**

See SW & Affidavit A2-9

AND TO SEIZE IT / THEM IF FOUND and bring it / them forthwith before me, or this court, at the courthouse of this court. This Search Warrant and Affidavit and attached, and incorporated Affidavit were sworn to as true and subscribed before me on this ___ day of _____ 20__, at ___ A.M. / P.M. Wherefore, I find probable cause for the issuance of this Search Warrant and do issue it.

_(Signature of Magistrate)_

HOBBS SEALING APPROVED: ☐ YES ☒ NO
SEARCH APPROVED: ☒ YES ☐ NO

Judge of the Superior Court of California, County of ____ Central Civil West, Dept. _100_

PATRICIA M. SCHNEGG
_(Magistrate's Printed Name)_

CR / DR #

# SEARCH WARRANT AND AFFIDAVIT

**LOCATIONS TO BE SEARCHED:**

1) 1195 West Victoria Street, Rialto, San Bernardino County, California-Described as a tan 2-story single family residence on the south side of Victoria St. west of Driftwood Av. It is the second house from the west end of the cul-de-sac of Victoria Street. It has an attached garage on the east side of the house. The numbers "1195" are painted on the curb just to the right of the driveway.

**PERSON:** Louie Alexander Sanchez, aka Louie Sanchez III, aka Louie Alex Sanchez, Date of Birth 05/16/1982, Male, Hispanic, 5' 11", 175 lbs, black hair, brown eyes, Tattoo on left side of neck, CDL # D12237726, CII# A12237726, FBI # 325520JB3

Detectives request a finger and palm print exemplar be taken from Louie A. Sanchez.

A saliva sample for the purpose of Deoxyribonucleic Acid (DNA) profiling from Louie A. Sanchez. Oral swabs are to be used to collect this reference sample and shall be collected in an approved manner by law enforcement, Criminalist, police officer, physician, registered nurse, licensed vocational nurse, or licensed medical technician.

Head hair sample to include as many of 100 hairs from the Louie A. Sanchez's head, to be collected from each region of his head.

Note: Should Louie A. Sanchez resist complying with the Court's request, reasonable force that does not shock the conscience of the Court may be used in order to compel production of the required samples.

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

**VEHICLES:**

1) 1997 Honda 4 door Maroon, California License 3WNU521, registered owner Sanchez, Louie Alex, or Sanchez, Luis, 1195 W Victoria Street, Rialto, Calif. 92376

2) 2003 Chevrolet Silver Silverado Pick-up truck California License 7E85218, registered owner, Sanchez, Luis, or Sanchez, Virginia, 1195 W. Victoria Street, Rialto, Calif. 92376.

**FOR THE FOLLOWING PROPERTY:**

Clothing; Any and all Dodgers jerseys including, but not limited to a white Dodgers jersey, blue denim shorts, a white men's tank top, blue or black baseball cap, black sun glasses, including but not limited to white tennis shoes.

Articles of personal property tending to establish the identity of persons in control of the premises, storage areas or containers where clothing, shoes, or documents can be found, including utility company receipts, rent receipts, cancelled mail, keys, sales receipts, purchase receipts, photographs, vehicle pink slips, and vehicle registration.

Any articles, newspaper clippings, news recordings regarding the Bryan Stow assault. Dodger tickets for March 31, 2011 season opener game against the San Francisco Giants, or receipt of purchase for the aforementioned game, the credit card used to purchase the tickets, Arrowhead Credit Union VISA # 4705230003163329 in the name of Louie A. Sanchez. White and blue Dodger Town towels given away on opening day.

Any and all cameras digital, conventional, or video for items stored electronically. Any photographs taken before, during, or after the March 31, 2011 game.

To include, but not limited to, any electronic information stored within cellular telephones found during service of the search warrant. This may include the subscriber identity module (SIM) card, stored telephone numbers, calls made and received records, photographs, voice memos, calendar date book information, contacts information, short message service (SMS) text messages, photographs, emails, Internet usage activity, stored or hidden passwords, as well as any identifying information about the possessor of the cellular phone to

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

1  include the telephone number for the phone and the Electronic Serial Number (ESN).

2      All electronic data processing and storage devices, computers and computer systems,

3  such as central processing units, internal and peripheral storage devices such as fixed disks,

4  internal and external hard drives, floppy disk drives and diskettes, tape drives and tapes, optical

5  storage devices, dongles, encryption keys, personal data assistants (PDA's) or other memory

6  storage devices; and any/all peripheral input/output devices such as keyboards, printers, video

7  display monitors, optical readers and related communication devices such as modems, and/or

8  other controlling devices, plotters, software to run programs, connecting cables and plugs,

9  peripherals such as joysticks, mouses, or other input devices, scanners, writing pads, manuals,

10  connecting switches, and interface devices; system documentation, operating logs and

11  documentation, software and instructional manuals. Computing or data processing software,

12  stored on any type of medium such as hard disks, floppy disks, CD-R's, CD-RW's, DVD's,

13  cassette tapes, or other permanent or transient storage medium.

14      Any records on magnetic media such as tape, cassette, disk, diskette or on memory

15  storage devices such as optical disks, programmable instruments such as "electronic

16  calendar/address books" calculators, or any other storage media, together with indication of use,

17  ownership, possession, or control of such records.

18      Any written, computer communication in printed or stored medium such as E-mail, chat

19  logs, text messages, calendar/address books, whether in active files, deleted files or

20  unallocated space on a computer memory, hard drive, floppy drive or any data storage media.

21      Search of all of the above items is for all files, data, images, software, operating

22  systems, deleted files, altered files, system configurations, drive and disk configurations, date

23  and time, and unallocated and slack space, for evidence of identity.

24

25

26


#24088

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

**Authority to Duplicate and Examine Electronic Media**

It is further requested that a forensic technician, sworn or non-sworn, be granted authorization to examine; make duplicate images/copies of the above-mentioned electronic media and to determine if evidence of the offenses above are contained therein.

Evidence copies of the items relating to these offenses will be created and retained for further proceedings and made available to the authorities.

SW & A1

#24088

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

**LOCATIONS TO BE SEARCH:** 1126 West Victoria Street, Rialto, County of San Bernardino, California-Described as a tan single-story single family residence with a red tile roof. It is the third house west of Driftwood Avenue, on the north side of Victoria Street. It has an attached garage on the west side of the house. The numbers "1126" are painted on the curb to the right of the driveway.

**PERSONS:**

Dorene Virginia Sanchez: Described as a Female, Hispanic, 5' 04", 110 lbs, brown hair, brown eyes, Date of Birth 8/27/1979, CDL B6636870.

Marvin Eugene Norwood, Jr. described as a Male, White, 6' 03", 240 lbs, brown hair, hazel eyes, Date of Birth 10/01/1980, CDL B7889883 CII# A24638608, FBI # 881173AC0, Plugs in ears, large tattoo on the right side of the neck, tattoo of red lips on the left side of the neck, multiple tattoos on both arms.

Detectives request a finger and palm print exemplar be taken from Marvin Eugene Norwood, Jr.

A saliva sample for the purpose of Deoxyribonucleic Acid (DNA) profiling from Marvin Eugene Norwood, Jr. Oral swabs are to be used to collect this reference sample and shall be collected in an approved manner by law enforcement, Criminalist, police officer, physician, registered nurse, licensed vocational nurse, or licensed medical technician.

Head hair sample to include as many of 100 hairs from the Marvin Eugene Norwood, Jr.'s head, to be collected from each region of his head.

SW & A1

#24088

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

Note: Should Marvin Eugene Norwood Jr. resist complying with the Court's request, reasonable force that does not shock the conscience of the Court may be used in order to compel production of the required samples.

**VEHICLES:**

1) 2005 Acura TL white, 4 door, California License 5NLX736, registered owner, Sanchez, Dorene V, 1195 W. Victoria Street, Rialto, Calif. 92376.

2) 2000 Chevrolet S-10 Pick-up truck white California License 6D57710, registered owner: Norwood, Marvin, 1126 W. Victoria Street, Rialto, Calif. 92376

**FOR THE FOLLOWING PROPERTY:**

Clothing; Any and all Dodgers' jerseys including, but not limited to a #5 white Dodgers jersey, a #16 Ethier Dodgers jersey, blue denim shorts, a black men's tank top, blue or black baseball cap, black sun glasses,

Articles of personal property tending to establish the identity of persons in control of the premises, storage areas or containers where clothing, shoes, or documents can be found, including utility company receipts, rent receipts, cancelled mail, keys, sales receipts, purchase receipts, photographs, vehicle pink slips, and vehicle registration.

Any articles, newspaper clippings, news recordings regarding the Bryan Stow assault.

Any and all cameras digital, conventional, or video for items stored electronically. Any photographs taken before, during, or after the March 31, 2011 game.

To include, but not limited to, any electronic information stored within cellular telephones found during service of the search warrant. This may include the subscriber identity module (SIM) card, stored telephone numbers, calls made and received records, photographs,

#24088

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

1  voice memos, calendar date book information, contacts information, short message service

2  (SMS) text messages, photographs, emails, Internet usage activity, stored or hidden

3  passwords, as well as any identifying information about the possessor of the cellular phone to

4  include the telephone number for the phone and the Electronic Serial Number (ESN).

5       All electronic data processing and storage devices, computers and computer systems,

6  such as central processing units, internal and peripheral storage devices such as fixed disks,

7  internal and external hard drives, floppy disk drives and diskettes, tape drives and tapes, optical

8  storage devices, dongles, encryption keys, personal data assistants (PDA's) or other memory

9  storage devices; and any/all peripheral input/output devices such as keyboards, printers, video

10  display monitors, optical readers and related communication devices such as modems, and/or

11  other controlling devices, plotters, software to run programs, connecting cables and plugs,

12  peripherals such as joysticks, mouses, or other input devices, scanners, writing pads, manuals,

13  connecting switches, and interface devices; system documentation, operating logs and

14  documentation, software and instructional manuals.  Computing or data processing software,

15  stored on any type of medium such as: hard disks, floppy disks, CD-R's, CD-RW's, DVD's,

16  cassette tapes, or other permanent or transient storage medium.

17       Any records on magnetic media such as tape, cassette, disk, diskette or on memory

18  storage devices such as optical disks, programmable instruments such as "electronic

19  calendar/address books" calculators, or any other storage media, together with indication of use,

20  ownership, possession, or control of such records.

21       Any written, computer communication in printed or stored medium such as E-mail, chat

22  logs, text messages, calendar/address books, whether in active files, deleted files or

23  unallocated space on a computer memory, hard drive, floppy drive or any data storage media.

24       Search of all of the above items is for all files, data, images, software, operating

25  systems, deleted files, altered files, system configurations, drive and disk configurations, date

26  and time, and unallocated and slack space, for evidence of identity.

#2408

# SEARCH WARRANT AND AFFIDAVIT

## Authority to Duplicate and Examine Electronic Media

It is further requested that a forensic technician, sworn or non-sworn, be granted authorization to examine; make duplicate images/copies of the above-mentioned electronic media and to determine if evidence of the offenses above are contained therein.

Evidence copies of the items relating to these offenses will be created and retained for further proceedings and made available to the authorities.

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES .
# SEARCH WARRANT AND AFFIDAVIT

Your affiant, Daniel T. Jenks #24605, is a Detective for the Los Angeles Police Department, currently assigned to Robbery-Homicide Division. Your affiant has been a police officer for 26 years. During his tenure, he has worked a variety of assignments to include patrol, narcotics buy team, narcotics major violators section, divisional detectives, homicide detective, and functioned as a supervisor of a gang unit. He has testified as a narcotics expert in local, state and federal courts. He has also testified as a gang expert in state court.

Your affiant has completed the following P.O.S.T. accredited courses: Narcotics, Basic Detective, Homicide Investigation, Coroner's Death Investigation, and Supervisor schools. Recognized experts in their respective fields taught these courses.

Your affiant has investigated in excess of fifty murders, the majority of which were drug or gang related occurrences. For the past eleven years, your affiant has been assigned to Robbery-Homicide Division working murder investigations.

On March 31, 2011, the victim, Bryan Stow, attended the opening day game for Major League Baseball, between the Los Angeles Dodgers and the San Francisco Giants. The game was played at Dodger Stadium, located at 1000 Elysian Park Boulevard, in the City and County of Los Angeles, California. Stow traveled from Northern California to attend the game with his three friends Cory Maciel, Matthew Lee, and Allen Bradford. Stow was seated in the right field pavilion at Dodger Stadium; all four men were wearing San Francisco Giants' clothing in support of their team. Stow was severely beaten in the parking lot of Dodger Stadium following the conclusion of the game.

Your affiant was assigned to the Bryan Stow assault on June 7, 2011 when Robbery-Homicide Division assumed responsibility for the investigation. During the course of the investigation, your affiant has learned the following either directly or indirectly from speaking with the previously assigned detectives and other detectives and officers involved in the investigation and / or from reviewing reports and summaries of interviews documenting the

MAf
#2408

# SEARCH WARRANT AND AFFIDAVIT

1  investigation.

2       Cory Maciel was interviewed by detectives and later completed a walk- through of the

3  crime scene. Maciel stated on March 31, 2011, he attended the Dodgers and Giants opening

4  game with his friends, including Stow, Lee and Bradford. Maciel stated during the entirety of

5  the game, he and his friends were continually harassed by Dodgers' fans because of their

6  Giants' apparel. Maciel also stated that to his knowledge the suspects involved in attacking

7  Stow were not part of the occurrences inside Dodger Stadium. At the conclusion of the game,

8  Maciel and his friends attempted to "catch a taxi" in the parking lot, however, they realized that

9  the meter would continue to run while they sat in traffic. As Maciel and his friends walked

10  through parking Lot 2, once again they were verbally accosted because of their attire and

11  support for the Giants. Maciel, Lee, Bradford and Stow all attempted to ignore the insults and

12  continued to walk away from the suspects. Maciel stated he observed Suspect-1 push Stow

13  into Maciel who was to the right of Stow causing them both to stumble. Maciel grabbed Stow

14  and spun him around, at which time they kept walking. Maciel said, "Let's get out of here." They

15  all began walking away from the suspects, between parked cars in the lot.

16       Maciel estimated they were approximately one hundred and fifty yards from the first

17  encounter, at which time he turned back to look in the direction of his friends. Maciel observed

18  Stow, who was the last person in the group, as they were walking away. Maciel observed

19  Suspect-1 go towards Bradford and punch him in the mouth which caused Bradford to fall down

20  on his buttocks. Maciel was concerned and saw that Suspect-2 was in front of Stow who was

21  facing away from Maciel. Suspect-1 ran around in circular fashion out to Stow's left rear and

22  threw a running punch at the left side of Stow's head without provocation or warning. Maciel

23  believed Stow was unconscious before his head hit the ground due to the fact that Stow's arms

24  went limp and he fell back on the pavement banging his head on the ground. Maciel began

J   running towards Stow, however, Suspect-2 ran towards Maciel and began swinging at Maciel.

26  Maciel then observed Suspect-1 kick Stow three separate times with full force, as hard as he

SW & A1

MHf
#24088

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

1  could in the head.  Maciel observed Stow's head move from the force of the kick.  Stow made

2  no attempt to defend himself and he appeared to remain unconscious. Maciel then observed

3  Suspect-2 kick Stow approximately two times in the torso.  Maciel noted Stow was not

4  protecting himself against the attackers and believed Stow was unconscious at the time he was

5  being assaulted.

6  　　　Maciel stated he and his friends ran to Stow's aid and briefly became involved in an

7  altercation with the suspects in an effort to protect Stow from further assaults.  Maciel's

8  attention turned away from the suspects, to the aid of Stow.  Maciel stated Stow was

9  unconscious and bleeding from his ears.  Maciel is a certified Emergency Medical Technician

10  and he quickly opined that Stow was suffering from a serious brain injury.

11  　　　Matthew Lee was interviewed by detectives and later completed a walk-through of the

12  crime scene. Lee stated on March 31, 2011, he attended the Dodgers and Giants opening day

13  baseball game at Dodger Stadium with his friends, Stow, Maciel and Bradford.  Following the

14  game, Lee and his friends walked through parking Lot-2. Lee stated as they were walking, they

15  became the subject of unruly Dodgers' fans, who began yelling derogatory statements to them

16  about their team affiliation.  Lee saw Stow get pushed by Suspect-1 into Maciel. Maciel grabbed

17  Stow and they began walking away.  As Lee was trying to catch-up to his friends, he noticed

18  Suspect-1 was following Stow and Maciel.  Lee got in between Maciel and Suspect-1 putting his

19  hand on Suspect-1's right shoulder.  Suspect-1 squared up and punched Lee in the face, right

20  under his left eye.  Lee looked at Suspect-1, but decided it was not the time to fight and walked

21  away.

22  　　　Lee and Bradford ran to catch up to their friends, in order to escape the suspects'

23  assaults.  As Lee and his friends attempted to walk away, between the parked cars, Lee heard

24  the sound of running and then feet shuffling.  Lee turned back and observed Stow, on the

25  ground being kicked in the head by the same suspects who had assaulted him and Bradford.

26  　　　Lee, Maciel and Bradford ran to Stow's aid. Once Lee, Maciel and Bradford were able

#24088

# SEARCH WARRANT AND AFFIDAVIT

1    to attend to Stow, Bradford attempted to open Stow's airway and stabilize him until Los Angeles
2    City Fire Department personnel arrived.

3      Following the aforementioned assault, Stow was treated and transported to the
4    University of Southern California Medical Center, where it was determined by Dr. Schlesinger
5    that Stow had suffered a fracture to the left side of his skull. Stow was ultimately placed into a
6    medically induced coma as a result of the injuries suffered from the assault. As of this affidavit,
7    Stow remains in a coma and in stable condition. Based on the opinions of treating physicians, it
8    is believed that Stow may suffer from irreversible brain damage, if he survives the injuries.

9      A detective recovered Bryan Stow's clothing and had it processed for evidence. Los
10    Angeles Police Department Scientific Investigation Criminalist recovered a hair from his shirt
11    and blood stains from his clothing.

12      Detectives interviewed Annamaria Davila on multiple occasions, who stated that she
13    arrived at the game and parked in Lot #2. She observed two males, a female and an
14    approximately 10 year old boy, a parking space and half away next to a white 4 door Acura or
15    Mitsubishi Galant with tan interior. She noted that the two males were standing at the back of
16    the car with the trunk open smoking what appeared to be marijuana. One of the males yelled at
17    the young boy telling him to get back in the car. The boy was somewhat defiant and didn't want
18    to get in the back seat of the car. The female then told the young boy to go to the front of the
19    car and stand near her. Davila was standing near her car selling Dodgers' hair bows. The two
20    males approached her and asked what she was doing. One of the males (Suspect-1) put his
21    arm around Davila when she noticed that he smelled of alcohol and appeared drunk. The
22    second taller male (Suspect-2) of the two appeared interested in the hair bows, so Davila began
23    looking for an Ethier #16 (Dodger player) bow since she noticed the woman near the car with
24    them was wearing an Ethier jersey.

25      Davila heard the same two males (Suspect-1 and Suspect-2), yelling at Giants fans and
26    made a point of saying, "If we see some Giants' fans, we're going to fuck' em up." At some

# SEARCH WARRANT AND AFFIDAVIT

1  point following the game, three young San Francisco Giants' fans walked past.   Davila

2  observed Suspect-1 and Suspect-2 swing at the young males in their 20's dressed in Giants

3  attire and laughing about the incident. Davila observed another four Giants' fans (the Stow

4  Group) walk by, at which time Suspect-1 and Suspect-2 began yelling obscenities towards

5  them. The Giants' fans continued to walk by Suspect-1 and Suspect-2. A short time later,

6  Suspect-1 and Suspect-2 walked away from Davila's vehicle. The female in the Ethier jersey

7  said, "Oh, they're talking shit, they're talking shit" (referring to the Stow group). The shorter of

8  the two males (Suspect-2) said, "What!" and just took off running (towards the Stow group).

9     A short time later,  Suspect-1 and Suspect-2 ran back to their vehicle which, was a

10  parking space and a half away from her, describing them as out of breath and anxious.

11  Suspect -1 had his jersey in his hand as he ran back towards their car.  The female was now

12  driving the car.  Suspect-2 was heard saying something to the effect of,  "let's get the fuck out of

13  here!" as he approached the waiting vehicle. She also heard Suspect-1 say, "Drive, drive,

14  drive!"  The vehicle went around the regular traffic flow towards the exit.

15     Annamaria Davila was shown a series of six individual photographs of white cars

16  consistent with her description.  She picked a photograph of a 2005 Acura TL 4 door as the

17  vehicle that looked like the car she saw parked in the lot near her vehicle. Davila stated that the

18  suspects later used the same vehicle to flee Dodger Stadium following the assault of Bryan

19  Stow.

20     Maciel was provided an opportunity to view the composite sketches that were

21  completed with the assistance of Annamaria Davila. Maciel indicated the composite accurately

22  depicted the suspects who assaulted Stow.

23     Lee was provided an opportunity to view the aforementioned composite sketch, after

24  which he stated that he did not recall the first suspect having a goatee or a mole, however, the

25  composite of the second suspect was accurate to the person he saw kicking Stow, while Stow

26  was lying on the ground.

#24088

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

1   Detectives reviewed a series of four separate clues which appeared to be related.  Two

2   of the clues were received on April 5, 2011, a third was received on April 6, 2011, and the fourth

3   was received on May 23, 2011.The clues all indicated that a male who was seated in Section

4   149 near the third base line was drunk and belligerent during the game.  He appeared to look

5   like the composite drawing and was wearing a white Dodger jersey and denim shorts.  He was

6   with another taller Hispanic or White male, a female, and a young boy.  The drunken Hispanic

7   male, hereafter, referred to as Suspect #1, was showing the young boy how to throw sunflower

8   seeds and peanuts at Giants' fans.  Suspect #1 also challenged Giants fans to fight.  At the end

9   of the game, Suspect #1 poured a bottle of soda on a female Giants fan seated nearby.  The

10   male Giants fan she was with became upset, Suspect #1 challenged the male to fight, but his

11   friend, hereafter referred to as Suspect #2, put his arms around Suspect #1 and restrained him.

12   Other Dodgers' fans nearby encouraged the two Giants' fans to leave while Suspect #1 was

13   restrained.

14   Earlier in the game, the two unrelated Giants' fans took a photograph of themselves

15   seated in the stadium.  In the background of the shot, Suspect #1, a young boy, and another

16   male can be seen.  Suspect #1 is using his phone; however, Suspect #2 is obscured due to the

17   angle of the photograph. Both Suspect #1 and Suspect #2 have black framed sunglasses on

18   their heads.

19   Based on the multiple reports of the belligerent Suspect #1, Detective C. Marsden,

20   Serial No. 34231, subsequently determined through the Los Angeles Dodgers, that Section

21   149, Seats 5, 6, 7, & 8 were purchased by Louie A. Sanchez, 1195 W. Victoria Street, Rialto,

22   California 92376, telephone number of (909) 874-2755.  The tickets were purchased with

23   Arrowhead Credit Union VISA # 4705230003163329.  Detective Marsden utilized department

24   resources to determine Louie Alex Sanchez, Date of Birth 05/16/1982, with CII #A12237726,

-5   resides at 1195 West Victoria street, Rialto, California.

26   Detectives determined that (909) 874-2755 is a published AT&T residential hardline

SW & A1

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES

# SEARCH WARRANT AND AFFIDAVIT

with a subscriber of Luis Sanchez 1195 West Victoria Street, Rialto, California 92376. Luis Sanchez is believed to be Louie A. Sanchez's father based on Louie A. Sanchez's prior probation report.

Detective Marsden was able to identify Louie A. Sanchez's sister as Dorene Virginia Sanchez, Date of Birth 08/27/1979, address of 1195 West Victoria Street, Rialto, California. Additionally, he determined that Dorene Sanchez has a child in common with Marvin Eugene Norwood, Jr., who also resides at 1126 West Victoria Street, Rialto, California, Date of Birth 10/01/1980.

Detectives were able to determine that Louie A. Sanchez has a Myspace account which includes photographs of himself and his son at a Dodgers' game wearing Dodgers' jerseys. Detectives determined that Marvin Eugene Norwood has both a Facebook and Myspace account. In photographs posted on Norwood's Facebook account, Norwood is captured wearing Dodgers' apparel. Dorene Virginia Sanchez has both Myspace and Facebook accounts; however, they are private which prevented investigators from viewing her postings and / or photographs.

Surveillance was conducted on July 23, 2011, by Robbery-Homicide Division, Special Investigation Squad Detectives. Detectives observed Louie A. Sanchez arrived in the afternoon at 1195 W. Victoria Street, Rialto, California, in his 1997 Maroon Honda, California License 3WNU521, (registered owner : Sanchez, Louie Alex, or Sanchez, Luis, 1195 W. Victoria Street, Rialto, Calif. 92376). On July 23, 2011, detectives also observed a 2003 Chevrolet Silver pick-up truck California license 7E85218 (registered owner: Sanchez, Luis, or Sanchez, Virginia, 1195 W. Victoria Street, Rialto, Calif. 92376) parked in the driveway of 1195 W. Victoria Street, Rialto, Calif. 92376. On July 24, 2011, detectives observed a 2003 Honda 2 door, silver California license 5FID312 (registered owner: Sanchez, Louie Alex, or Sanchez, Luis, 1195 W. Victoria Street, Rialto, Calif. 92376) also parked in the same driveway.

On July 24, 2011, Special Investigation Squad Detectives conducted surveillance at

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

1  1126 West Victoria Street, Rialto, California. Detectives observed Dorene Sanchez leave 1126

2  West Victoria Street, Rialto, California, and enter her 2005 Acura TL white, California License

3  5NLX736 (registered owner: Sanchez, Dorene V. 1195 West Victoria Street, Rialto, Calif.

4  92376). In the afternoon, they observed a male arrive at the location in a 2000 Chevrolet S10

5  white pick-up truck California license 6D57710 (registered owner: Norwood, Marvin, 1126 West

6  Victoria Street, Rialto, Calif. 92376). Later in the evening, detectives followed the 2005 Acura

7  California license 5NLX736, which was stopped for speeding by the California Highway Patrol.

8  Following the stop, detectives determined that the driver was Marvin Norwood, Jr., California

9  driver's license B7889883. They also determined that the passenger was Dorene Sanchez.

10  Over the course of the following two weeks, Special Investigation Detectives observed Louie A.

11  Sanchez come and go from 1195 West Victoria Street several times. Louie A. Sanchez was

12  observed leaving 1195 West Victoria Street early in the morning prior to 0700 hours, after which

13  detectives observed him go to his work location. Later in the afternoon, he would leave his

14  work location and return to 1195 West Victoria Street, his place of residence. This is consistent

15  with his address of record on his California Driver's License D1208996 of 1195 West Victoria

16  Street, Rialto, California, 92376.

17      Special Investigation Detectives observed Dorene Sanchez and Marvin Norwood, Jr.

18  several times come and go from 1126 West Victoria Street, Rialto, California, a few houses

19  away from her brother Louie and parents' residence at 1195 West Victoria Street. Marvin

20  Norwood, Jr. was observed leaving early in the morning, prior to 0700 hours, and driving to Los

21  Angeles to a construction site in his 2000 Chevrolet pick-up truck, California license 6D57710.

22  According to public databases, Dorene Sanchez is on the title of 1126 West Victoria Street,

23  Rialto, California, 92376. Although Marvin Norwood, Jr. has not updated his California Driver's

24  license B7889883, he has registered his vehicle 2000 Chevrolet pick-up California license

25  6D57710, at 1126 West Victoria Street, Rialto, California, 92376, and is residing at the location.

26      Detectives reviewed the criminal history for Louie A. Sanchez and determined that he

M#4 #24088

# SEARCH WARRANT AND AFFIDAVIT

1  has the following convictions: January 24, 2003 misdemeanor conviction for Penal Code

2  Section 273.5 (San Bernardino Case No. MSB066236),  October 15, 2004 misdemeanor

3  conviction for Penal Code Section 12031(A) (1), August 1, 2006 misdemeanor conviction for

4  Vehicle Code Section 23152(A), March 3, 2008 misdemeanor conviction for Penal Code

5  Section 12031(A) (1), and a March 20, 2008 conviction for Vehicle Section 2800.2(A) for which

6  he received a 16 month prison sentence.

7       Detectives reviewed the criminal history for Marvin Eugene Norwood, Jr. and

8  determined he had the following: September 5, 2003 misdemeanor conviction for Vehicle Code

9  Section 23152(B), June 16, 2006, felony conviction for Penal Code Section 273.5, January 12,

10  2001 misdemeanor conviction for Penal Code Section 415.

11      Detectives contacted several individuals who were seated near Louie A. Sanchez in

12  Section 149 Seats 5, 6, 7 & 8. On June 29, 2011, a group of photographs were shown to

13  Marina Hubl, during which she identified Louie A. Sanchez as the person seated near her in

14  Section 149 who was belligerent and trying to fight at the end of the opening day Dodgers /

15  Giants game. Alexander Hubl was also shown a series of photographs. He identified Louie

16  Sanchez and Marvin Norwood as the two males seated near him in Section 149. Hubl also

17  identified Louie Sanchez's son as being seated next to his father at the game. He was "Pretty

18  positive" that a photograph of Dorene Sanchez was the woman seated with the two males and

19  young boy. Detectives also interviewed Patricia Perez who positively identified Louie Sanchez,

20  Marvin Norwood, Dorene Sanchez and Louie Sanchez's son from the photographs. She added

21  that the son was bigger and had more hair than shown in the photograph.

22      On July 1, 2011, pursuant to a search warrant for Tower Dumps from the major cellular

23  phone companies in and around Dodger Stadium on the night of the assault of Bryan Stow,

24  detectives determined that there was a telephone call from Verizon Wireless Telephone (909)

25  278-0961 (subscribed to Dorene Sanchez) to 1 (951) 809-9153, on 3/31/2011, at 2022 hours

26  for 34 seconds. According to the Verizon Wireless customer records, the phone is subscribed to

SW & A1

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

1   Dorene Sanchez with an address of 1126 West Victoria Street, Rialto, California. The cell site

2   information indicates that the call was made in close proximity to Dodger Stadium.

3       On July 5, 2011, Detective C. Marsden, Serial No. 34321, contacted Diedre Fox who

4   was seated in Section 151 row F across the aisle from Louie A. Sanchez, Marvin Norwood, Jr.,

5   and Dorene Sanchez. Fox stated that she had taken a video of her family and the people

6   seated near her. On July 6, 2011, she provided the video to Detective Marsden. Detective

7   Marsden reviewed the video which was shot from the opposite point of view as the previously

8   obtained photograph. The video depicts Marvin Norwood, Jr., who is best captured in the

9   video. It appears to also depict Dorene Sanchez, Louie A. Sanchez, and Louie Sanchez, Jr.

10       On March 31, 2011, Monique Gonzalez and her two friends, Sandra Luna and Areli

11   Porras, drove to opening night of the Los Angeles Dodgers' season home stand. After the game

12   was over, Gonzalez did not witness any incidents involving Dodgers' and Giants' fans, as she

13   walked to her car with Luna and Porras. Gonzalez entered her vehicle with Porras (front

14   passenger) and Luna (rear passenger) and they began to drive off in a northwestern direction,

15   towards the Elysian Park exit. The parking lot was congested with vehicular and pedestrian

16   traffic. As Gonzalez was attempting to leave the parking lot, she looked into her side view mirror

17   of her vehicle and observed a fight. Gonzalez's driver's side window was rolled down, so she

18   yelled out, "Leave him alone!" Initially, Gonzalez observed and heard two Dodgers' fans and

19   three Giants' fans exchanging words. She did not know what the exact conversation was

20   between the two groups of fans, but she heard one of Stow's friends say, "We're going home,

21   just leave us alone!" When Gonzalez first observed both of the groups, they were

22   approximately 15-20 feet behind her. Gonzalez looked back and forth from her side view mirror

23   and over her left shoulder and observed Stow walking away from the two Dodgers' fans.

24   Gonzalez said the other Giants' fans were over the incident involving the two Dodgers' fans, so

25   they started to walk away. One of the Dodgers' fans, hereafter referred to as Suspect-1, walked

26   behind Stow and hit him on the left side of his head, causing him to fall to the ground and hit his

SW & A1

MM
#24088

# SEARCH WARRANT AND AFFIDAVIT

1 head. As Stow's friend was trying to revive Stow, Suspect-1 walked over towards him (Stow)

2 and kicked him in the head. Suspect-1 and the second Dodgers' fan, hereafter referred to as

3 Suspect-2, fled the location after they observed Stow's friend attempting to revive him. Both

4 suspects ran in the direction of Dodger Stadium. Gonzalez said Suspect-2 was not involved in

5 the altercation. She believes Suspect-2 was looking out to see if the other Giants' fans were

6 going to intervene in the fight.

7      Gonzalez said Luna and Porras both exited her vehicle during the incident. She does

8 not know where Porras went, but Luna was in the vicinity of Stow because she said she

9 observed blood draining from his ear.

10      On July 5, 2011, Detectives Holmes and Evens met with witness Monique Gonzalez.

11 She was read the photographic admonition which she acknowledged that she understood. She

12 was shown a six pack photographic line-up, which included a photograph of Louie A. Sanchez.

13 Gonzalez stated, "#6 resembles the guy I saw. He looks most like the guy that was with the

14 taller person that I saw kick Stow. His tattoo looks like the same one I saw on the left side of

15 the neck. The shape of the eyes and eyebrows makes me think this is the same guy. I thought

16 he was a little darker than in this photo. The other guy was definitely lighter than #6."

17      Note: photograph #6 was a photograph of Louie A. Sanchez.

18      On July 5, 2011, Detective Holmes and Evens interviewed witness Ernesto Alvarez,

19 who was present in the parking lot on March 31, 2011, at the time of the Bryan Stow assault.

20 Alvarez was one of the original 911 callers. He was read the photographic admonition and

21 shown a six pack, which included a photograph of Louie A. Sanchez in position number 6.

22 Alvarez stated, "#6 looks most like the person I saw that struck the victim. I would be absolutely

23 positive if I saw the body. By his face that is the person I saw hit the victim." He also stated,

24 "#5 looks like the other guy as well by the facial hair, body type and he was light skinned like

25 that" (#5 is a filler photograph).   Alvarez was then shown a series of six photographs which

26 included a photograph of Marvin Norwood, Jr. Alvarez looked at Norwood's photograph and

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

1  said, "The facial hair on this photo was the same, but in this photo his head looks bigger than I

2  remember. Of all the photos his facial hair stands out. I remember he had plugs like this in his

3  ears" (Norwood's photograph was the only photograph with a suspect that had "plugs" in his

4  ears).

5       Note: previous to the photograph being shown, no witness mentioned the "Plugs" in the

6       suspect's ears. Plugs are a body modification that expands a hole in the ear lobe. The

7       hole is expanded by increasing the size of the "Plug" or "Gauge."

8       On July 5, 2011, Detective D. Holmes, Serial No. 34783, and L. Evens, Serial No.

9  31976, interviewed witness Avi Durchfort who was present in the parking lot at the time of the

10  Bryan Stow assault.  He was read the photographic admonition and shown a six pack

11  photographic lineup which included Louie A. Sanchez in position number 6. He reviewed the

12  photographs and stated, "#6 looks similar to the guy I saw. #5 also looks similar but looks too

13  muscular. The person I saw jumping up and down had a big head like #6 and looked more fat

14  than muscular. He was then shown a series of six individual photographs. He selected the

15  photograph of Marvin Norwood and stated, "This guy looks eerily similar to the person I saw

16  with the other guy. He looked more like the taller and more muscular of the two. I never saw

17  him strike the victim but he was yelling at him. Of all the people I saw, he is the one that stands

18  out as the second one."

19       On July 5, 2011, Detective D. Holmes, Serial No. 34783, and L. Evens, Serial No.

20  31976, interviewed witness Nathan Durchfort. He was read the photographic admonition and

21  shown a six pack photographic lineup which included Louie A. Sanchez in position number 6.

22  He reviewed the photographs and stated, "#6 is exactly the same facial hair and mustache. His

23  face is exactly how I remember it, because it was round like that. His hair was just a little bit

24  longer and I don't remember seeing the tattoo, but he could have had one. His eyebrows are

25  very close to how I remember. The guy I saw on the T.V. is not the guy involved."

26       On July 7, 2011, Detective D. Holmes, Serial No. 34783, and L. Evens, Serial No.

# SEARCH WARRANT AND AFFIDAVIT

31976, interviewed witness Megan Duffy. Duffy was seated in her vehicle at the time of the Bryan Stow assault. She was read the photographic admonition and shown a series of six photographs including Marvin Norwood, Jr. She stated, "This person I believe is the person who landed on my car. I know it is him by his eyes. I also remember he had something in both of his ears. At the time of this incident, he didn't have a hat on as he does in this photo." The photograph she selected was of Marvin Eugene Norwood, Jr. She was also shown a six pack photographic line-up which included a photograph of Louie A. Sanchez. She did not identify anyone in the six pack.

Note: On the night of the Stow assault, two finger prints and at least one palm print were recovered by a Los Angeles Police Department Scientific Investigation Division Latent Print Expert from the front end of Megan Duffy's vehicle. The two finger prints were later determined to be that of Brian Stow's friend, Allen Bradford, who was also assaulted the night of March 31, 2011. The palm print has not been identified.

It has been your affiant's experience that principals and co-principals involved in crimes often communicate via telephone. Your affiant has yet to determine cellular telephone numbers for Louie Sanchez or Marvin Norwood, Jr., however, in one of the photographs provided by a citizen it appears that Louie Sanchez is using a cellular telephone as he sat in his seat during the game. Your affiant believes that an examination of the cellular telephones recovered at their respective residences or from their person will identify their corresponding telephone numbers.

Based on your affiant's training, knowledge, and experience he is aware that cellular telephones utilize technology such as cell sites and satellites in order to facilitate telephone communications. Once a telephone number is determined detectives can request that telecommunications companies provided cell site and / or satellite information to determine the general location of a cellular telephone at the time a call was placed. This would tend to establish that the suspects were at or near the scene of the assault if a call was placed or

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

1   received.

2   Additionally with modern cellular telephones, your affiant is aware that photographs,

3   videos, text messages, and email, may be stored and therefore recovered which may discuss

4   the Bryan Stow assault or contain photographs or videos of the assault. Additionally, the

5   contacts stored in the telephone may lead investigators to individuals to whom the suspects

6   may have made admissions.

7   Based on your affiant's training, knowledge and experience he is aware that principal

8   and /or co-principal to a crimes often communicate via internet facilitated by personal

9   computers. A forensic examination of a personal computer may result in locating email

10   accounts, social networking accounts to include Facebook and My space, internet blogs

11   including Twitter, to determined account names and passwords necessary to retrieve content

12   which may include admissions and or discussions related to the Bryan Stow assault. These

13   devices can also be utilized to access and store media including: print, radio, television, and

14   internet related articles related to the Bryan Stow Assault. Additionally, media from other

15   personal devices such as photographs and videos can be downloaded to personal computers

16   for storage.

17   Based upon the investigation in this case, set forth in detail above, I assert that:

18   There is probable cause to believe that Louie A. Sanchez, Marvin Eugene Norwood, and

19   Dorene Virginia Sanchez were involved in the March 31, 2011 assault of Bryant Stow at Dodger

20   Stadium in the City and County of Los Angeles. Your affiant believes that should a search

21   warrant be issued for the residence of Louie A. Sanchez, and the residence of Marvin Eugene

22   Norwood, Jr., and Dorene Virginia Sanchez, that additional evidence will be recovered

23   establishing their respective involvement and participation in the assault of Bryan Stow. Your

24   affiant requests probable cause arrest warrants be issued for Louie A. Sanchez and Marvin

_5   Eugene Norwood, Jr., for the offense of section 203 of the California Penal Code, Mayhem.

26   Your affiant requests a probable cause arrest warrant be issued for Dorene. V. Sanchez for the

#24088

STATE OF CALIFORNIA - COUNTY OF LOS ANGELES
# SEARCH WARRANT AND AFFIDAVIT

1  offense of Section 32 of the California Penal Code, accessory.

2  　　　Your affiant requests that the search warrant include authority to collect buccal swabs

3  for DNA , hair samples, and finger print exemplars from both Louie A. Sanchez and Marvin

4  Eugene Norwood, Jr., due to the recovery of blood and hair evidence from victim Bryan Stow's

5  clothing.  Detectives also request authority to obtain print exemplars from both Louie A.

6  Sanchez and Marvin Norwood, Jr., due to the fact that an unidentified palm print was recovered

7  from witness Megan Duffy's vehicle.

8  　　　Your affiant requests authorization for night time service, due to the fact that both Louie

9  A. Sanchez and Marvin Norwood, Jr., leave their respective residences prior to 0700 hours on a

10  daily basis; the fact that they both live in close proximity to each other on the same street; the

11  likelihood that one or both of the locations could be compromised and evidence be removed or

12  destroyed; if one of the three was arrested and communicated / or was seen being taken into

13  custody by family, friends or neighbors after which a telephone call could be made to notify the

14  outstanding suspect(s).

15

16

17

18

19

20

21

22

23

24

25

26

SW & A1

#24088